Herbert E. KELLY, Sr., et al., Plaintiffs-
Appellees,

v.

Kenneth GUINN, Superintendent of
Schools, Clark County School District,
et al., Defendants-Appellants.

Nos. 71–2332, 71–2340 and 71–2422.

United States Court of Appeals,
Ninth Circuit.

Feb. 22, 1972.

As Modified on Denial of Rehearing
April 3, 1972.

Robert L. Petroni (argued), Las Vegas, Nev., for appellant in Nos. 71–2332 and 71–2340.

Norman J. Chachkin (argued), Jack Greenberg, New York City, Frank A. Schreck (argued), Charles L. Kellar, Las Vegas, Nev., for appellee in Nos. 71–2332 and 71–2340.

Norman J. Chachkin (argued), Jack Greenberg, New York City, Charles L. Kellar, Las Vegas, Nev., for appellant in No. 71–2422.

Robert L. Petroni (argued), Frank A. Schreck (argued), Las Vegas, Nev., for appellee in No. 71–2422.

Before BROWNING and KILKENNY, Circuit Judges, and JAMESON,* District Judge.

BROWNING, Circuit Judge:

The district court held that elementary schools in the Clark County (Nevada) School District, which includes the City of Las Vegas, were racially segregated. The court ordered implementation of a so-called "Sixth Grade Center Plan" to desegregate the schools. Defendant school officials appeal, asserting that no constitutional violation was established. Plaintiffs cross-appeal, contending that the "Sixth Grade Center Plan" is inadequate, and that the district court erred in failing to award attorneys' fees and costs. We affirm on both appeals.

At the outset we emphasize that the individual defendants are sued only in their representative capacity as incumbent officials of the Clark County School District. The policies which we hold violative of the Constitution were initiated and implemented primarily by their predecessors. In the words of the district court:

> "The present members of the Board may not be personally responsible for the actions of their ancestors in office, but we are concerned with a school district and its policies and actions, and not with the particular people who may have been vested with control from time to time. Quite realistically, the present Board is saddled with the mistakes of its predecessors and is obligated to take effective steps to reverse the segregation trend, however drastic the cure may be."

The district court also stated that aspects of defendants' efforts to eliminate segregation "are useful and disclose an enlightened attitude . . . regarding the social problems inherent in segregated schools."

We agree with this appraisal.

I

## Procedural History

This is a class action under 42 U.S.C. §§ 1981 and 1983 (1964), alleging violation of the Fifth and Fourteenth Amendments. It was filed May 13, 1968, on behalf of the named plaintiffs and other residents of Clark County. The Superintendent of Schools and the members of the Board of Trustees of the Clark County School District were made defendants. The complaint alleged that the policies and practices of the school district "obligate the great majority of the Negro children to attend segregated schools in the area [of Las Vegas] known as the West Side." Equitable relief was sought.

Trial was held October 14, 15, and 16, 1968. Upon completion of the testimony, the district court orally announced its conclusion that elementary schools in Las Vegas were racially segregated. The court instructed school officials to prepare and submit an integration plan.

On April 10, 1969, the school district submitted "An Action Plan for Integration of the Six Westside Elementary Schools," referred to as the "freedom of choice" plan. It permitted black students to transfer to predominately white schools elsewhere in the district, and permitted white students to transfer from these predominately white schools to a "prestige" school established within the Westside area. A variety of special programs and a low teacher-pupil ratio were offered to induce white students to transfer to the "prestige" school.

On June 23, 1969, the court entered an order approving the "freedom of choice" plan for the school year beginning September 1969. The order required school officials to file a progress report by March 1, 1970. The required report was filed. Plaintiffs filed a response, and a hearing regarding the effectiveness of the "freedom of choice" plan was held on August 17 and 19, 1970.

---

* Honorable William J. Jameson, Senior Judge, United States District Court for the District of Montana, sitting by designation.

On December 2, 1970, the court entered its judgment and decree.[1] The court concluded that the "freedom of choice" plan had failed to integrate elementary schools in the Clark County School District, and would fail to do so in the future. The court ordered the school district to adopt and effectuate an integration plan for the school year beginning September 1971 that would result in a black student enrollment of no more than 50 per cent in any grade level in any elementary school in the district.

· The school district appealed from the December 2, 1970, judgment. Meanwhile, however, pursuant to the judgment, the school district prepared and submitted a "Sixth Grade Center Plan." Under this plan each Westside elementary school was to be clustered with a group of white elementary schools, with the Westside school serving as a sixth grade attendance center for the group.

A number of post-judgment motions were filed. The school district filed a motion for reconsideration of the judgment based upon the subsequent decision in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and sought a stay pending appeal. On their part, plaintiffs filed a motion to amend the "Sixth Grade Center Plan," and to stay its implementation. They also filed a motion for allowance of attorneys' fees and costs.

We remanded the case to the district court to permit it to consider these motions. On June 11, 1971, the district court granted the school district's motion to stay the December 2 judgment pending appeal, and denied the remaining motions.

The school district appealed the denial of their motion to reconsider the judgment. Plaintiffs cross-appealed from the denial of their motion to modify the "Sixth Grade Center Plan," and from the denial of their motion for attorneys' fees and costs.

Plaintiffs also appealed the granting of the school board's motion for stay pending appeal, and petitioned this court to vacate the stay. At our request the district court entered special findings of fact relevant to this application. On August 18, 1971, we denied plaintiffs' application to vacate the district court's stay, and ordered the various appeals expedited.

## II

### Factual Background

In 1954, when Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, was decided, there were only three schools in the Westside area. All had racially mixed enrollments. After 1954 the population of Westside increased rapidly and became increasingly black in racial composition.

In 1956, to avoid racial segregation in junior and senior high schools, the school district announced that no new junior and senior high schools would be built in Westside. Thereafter, Westside pupils were bused to junior and senior high schools outside the area. At these grade levels the Clark County school system was, and is, completely integrated.

In contrast, between 1956 and 1966, four new elementary schools were constructed in Westside and one of the two existing schools was extensively renovated to accommodate additional students. The first of the four new elementary schools opened the same year the school district decided to open no new secondary schools in the area to avoid racial segregation at those grade levels. When the complaint was filed in 1968, black student enrollment in each of the six Westside elementary schools exceeded 97 per cent.

During the same period, in 1965, the school district closed two predominately white schools on the fringe of Westside, between black and white neighborhoods. If these schools had not been closed, their enrollment would now be about

1. The judgment was amended in minor respects on February 8, 1971. See note 12.

 

half white students and half black.[2] At about the same time, the school district built a new elementary school in a more distant white residential area.[3]

When the complaint was filed, 102 of the 1359 teachers in Clark County elementary schools were black. Of the 102 black teachers, 83 were assigned to Westside schools, and only 19 to schools outside the area. These figures appear to be representative of prior years.[4]

## III

### The Constitutional Violation

Defendants argue that under Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. 1, 91 S.Ct. 1267, a school district is required to integrate racially imbalanced schools only if the school district caused the racial imbalance. Defendants contend that the segregated conditions in Clark County's elementary schools do not result from discriminatory acts or omissions of the school district. They maintain that the school district is simply adhering to a neighborhood school policy under which children are assigned to schools nearest their homes. They claim that whatever imbalance exists stems not from any official action of the school district but rather from the racial composition of the Westside population, which is almost completely black.

Defendants point out that the *Swann* case involved a school district "having a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race." 402 U.S. at 5–6, 91 S.Ct. at 1271. Defendants claim that there has been no finding that the segregated condition in Clark County elementary schools are a result of such official action. Therefore, since no constitutional violation by the school district has been established, and since, under *Swann*, there is no legal requirement that racial balance exist in every school (*see* 402 U.S. at 24, 91 S.Ct. 1267), they conclude that they have no affirmative duty to integrate Clark County schools.

We agree with defendants that it is clear from *Swann* that a court has no power to order a school district to take steps to integrate its schools unless the court first finds that the schools have been operated in a manner violative of the Constitution. 402 U.S. at 16, 91 S.Ct. 1267. Defendants are incorrect, however, in saying that the district court found no official action on their part constituting a constitutional violation.

In its judgment of December 2, 1970, the district court referred to the fact that the school district had adopted a

2. The school district points out that counsel stipulated that these schools were closed because of their physical condition. But counsel did not stipulate that this was the sole reason for the closings. Defendant Guinn, Superintendent of Schools, testified that the schools were closed in part because it was foreseen that the student body would become increasingly black due to changing residential patterns. The reply brief filed on behalf of the school district agrees that this was one reason for the closings. It is not suggested that these schools could not have been renovated for continued elementary school use, as other schools in Westside were. Both schools are still used for special classes and other educational purposes.

3. The present policy of Clark County School District is to phase out "neighborhood" elementary schools in Westside. No new elementary schools have been built in Westside since 1966.

4. Plaintiffs argue that the evidence also shows (1) that white students were bused to white schools although Westside black schools were closer to their homes; (2) that efforts of Westside black students to transfer to white schools were frustrated; (3) that attendance zones were manipulated to perpetuate black segregation in Westside schools; (4) that only Westside schools were treated as "neighborhood" schools, and busing was common outside Westside. However, either the facts asserted or their significance are disputed. The district court did not resolve these disputes either by express findings or by clear implication.

construction policy with respect to junior and senior high schools that effectively eliminated segregation at those grade levels. The court then continued:

"While eliminating segregation for the students above the sixth grade level, the District, at the same time, aggravated the incidence of segregation at the elementary level by constructing two new elementary schools [5] in the black residential area. This bifurcated neighborhood school policy of the Clark County School District is principally responsible for the aggravation of racial segregation in the elementary schools. The policy was implemented long after Brown v. Board of Education, 349 U.S. 294 [75 S.Ct. 753, 99 L.Ed. 1083] had clearly abjured the employment of official power to further the maintenance of segregated schools . . .." [6]

This is a clear finding that the school board furthered racial segregation by official conduct beyond the mere adoption and administration of a neutral, neighborhood school policy.[7] This finding is supported by the record, and establishes a constitutional violation.

Not surprisingly, the record contains no express mandate or sanction by any state agency of racial segregation in Clark County elementary schools. Historically, racial segregation has rarely been required by law in northern and western states. There was other evidence, however, to support the district court's ultimate finding that the Clark County School District used its official powers to further the maintenance of segregated schools.

1. The existence of almost total segregation of the races in the elementary schools of racially mixed Clark County

5. Four new schools were constructed. It is not clear why the district court referred to only two of them. It may have done so because the President of the Board of Trustees specifically admitted that segregated conditions were aggravated by the construction of these two schools.

6. Whatever the district court may have meant by its occasional references to "de-facto segregation" in the Clark County School District, it is clear from the language of the district court quoted in the text that the court did *not* define the term, as the Supreme Court did in *Swann*, as referring to a situation "where racial imbalance exists in the schools *but with no showing that this was brought about by discriminatory action of state authorities*." 402 U.S. at 17–18, 91 S.Ct. at 1277 (emphasis added).

In the hearing on the school district's motion to reconsider the December 2 judgment, the district court heard extensive argument that *Swann* required proof that racial imbalance in the schools resulted from discriminatory action by the school district. In colloquy with counsel, the district court indicated that it so understood the holding in *Swann*. The court rejected the motion to reconsider nonetheless, stating that nothing had been brought to the court's attention that would justify reconsideration of its judgment.

7. We do not mean to suggest that we would agree with plaintiffs' assumption that the Constitution is not violated by implementation of a "neighborhood school" policy in a school district having racially

segregated residential patterns when the foreseeable result in segregation of the races in the district's schools. That question remains open. It has been argued with some force that a school authority cannot ignore the obvious fact of racially segregated residential patterns in making decisions regarding school attendance zones, and that if it elects to impose so-called neighborhood school attendance zones upon racially segregated residential areas it is responsible for the racially segregated schools that are the readily foreseeable consequence of its conduct. Fiss, The Charlotte-Mecklenburg Case—Its Significance for Northern School Desegregation, 38 Chi.L.Rev. 697, 706–07 (1971); Fiss, Racial Imbalance in the Public Schools, 78 Harv.L.Rev. 564, 584–88 (1965); *see* Bradley v. Milliken, 338 F.Supp. 582, at 592 (E.D.Mich., 1971).

Of course, under *Swann* any racially motivated manipulation of attendance zones violates the Constitution. *See* Dimond, Segregation Northern Style, 9 Inequality in Education (Harvard Center for Law & Education) 17, 19–20 (1971). The Supreme Court also pointed out that choices made by a school authority in locating schools may contribute to the creation of the residential segregation itself, making the school authority responsible for the school segregation resulting from the residential segregation. 402 U.S. at 20–21, 91 S.Ct. 1267. *See generally* Karst & Horowitz, Emerging Nationwide Standards—Charlotte and Mobile 1971, 1 Black L.J. 206, 209–10, 215–20 (1971).

School District is itself a relevant factor. As Chief Justice Burger said in Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 25–26, 91 S.Ct. at 1281: "Schools all or predominately of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation."

2. The almost completely black composition of the teaching staffs of Westside schools when the complaint was filed, combined with the district's methods of placing teachers (*see* note 8), established a prima facie case of violation of substantive constitutional rights.

This is settled by *Swann*. There the Court stated, "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff . . . a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." 402 U.S. at 18, 91 S.Ct. at 1277. *See* Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

This is not to say that racially balanced faculties are constitutionally required, for they are not. *See* United States v. Montgomery County Board of Education, 395 U.S. 225, 236, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). Rather, teacher assignment is so clearly subject to the complete control of school authorities, unfettered by such extrinsic factors as neighborhood residential composition or transportation problems, that the assignment of an overwhelmingly black faculty to black schools is strong evidence that racial considerations have been permitted to influence the determination of school policies and practices. "[T]he school district's obvious regard for race in assigning faculty members and administrators is a factor which may be considered in assessing motives underlying past decisions which resulted in segregation." Davis v. School District of Pontiac, Inc., 443 F.2d 573, 576 (6th Cir. 1971).[8]

3. The prima facie case of constitutional violation established by proof of virtually complete racial segregation of teachers in Clark County elementary schools was buttressed by the evidence showing that segregation of pupils by race was aggravated by the school district's practices in building new schools and abandoning old ones. As we have seen, while the Clark County School District built new elementary schools in the black residential area and in a distant white residential area, at the same time it closed existing schools in the fringe areas, in part to avoid their integration.

Like assignment of faculty by race, school construction policies that create or aggravate racial segregation are among the "important indicia of a segregated system." Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 18, 91 S.Ct. at 1277.

---

8. During oral argument in this court, defendants' counsel offered the suspiciously tardy suggestion that the school district may have acted on the theory that black students would respond better to black teachers, *see* Keyes v. School District No. 1, Denver, 445 F.2d 990, 1007 (10th Cir. 1971), cert. granted 404 U.S. 1036, 92 S. Ct. 707, 30 L.Ed.2d 728 (1972). Counsel's suggestion is no substitute for proof in the trial court.

The inference of racial motivation is not weakened by the fact that teacher assignments were made primarily on the basis of requests by the principal of each school, or by the teachers themselves. Since the power to assign teachers clearly belonged to school authorities, the principals, or teachers, must be viewed as acting as agents of the school district in exercising that power, particularly when, as here, the power is exercised over a long period of time in a way that is obviously racially influenced. *See* Sedler, School Segregation in the North and West, 7 St. Louis L.J. 228, 236 (1963). While the school district could independently assign black teachers to schools outside Westside, the statistics reveal that this has seldom been done. *See* text accompanying note 4 *supra*.

As the Court pointed out, choices made by school authorities in the location of schools

"have been used as a potent weapon for creating or maintaining a state segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since Brown [v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)] closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' * * *

In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight." 402 U.S. at 21, 91 S.Ct. at 1278.

See also United States v. Montgomery County Board of Education, supra, 395 U.S. at 231, 89 S.Ct. at 1670.

■ 4. Finally, the school district's decision to continue a "neighborhood" school policy at the elementary level while abandoning it at the secondary level for the very reason that the policy patently furthered racial segregation lends weight to the inference that the school district's purpose in constructing, renovating, and abandoning schools was to limit integration at the elementary level.

■ For these reasons we conclude that there was ample evidence to support the district court's finding that the Clark County School District used its power to aggravate segregation in elementary schools in violation of the Constitution.

## IV

### Remedy

■ A constitutional violation having been established, the district court properly called upon the Clark County School District to come forward with a plan to eliminate the vestiges of state-imposed segregation. The school district was "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board, supra, 391 U.S. at 437–438, 88 S.Ct. at 1694. See Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 15, 91 S.Ct. 1275.

■ The district court also properly rejected the school district's "freedom of choice" plan after a year's trial. "[A] school authority's remedial plan . . . is to be judged by its effectiveness," Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 25, 91 S.Ct. at 1280, and the freedom of choice plan proved entirely inadequate.

■ "Freedom of choice" plans usually, if not invariably, fail to eliminate school segregation. Such plans rest upon the theory that the school district's entire obligation is to refrain from excluding any student from any school because of race. But once it is determined that a school district has contributed to the creation and maintenance of segregation, neutrality is no longer enough. Then the school district's duty is not limited to the removal of discriminatory bars to school integration; it is charged with an affirmative duty to eliminate segregation.[9] "Freedom of choice" plans operate "simply to burden children

---

9. Nor is the duty limited "to the correction of that portion of the segregation that might reasonably be attributable to past discrimination." Once it has been established that "past discrimination played some causal role in producing segregated patterns," Swann requires "the complete elimination of those patterns." Fiss, The Charlotte-Mecklenburg Case, supra note 7, 38 Chi.L.Rev. at 705.

and their parents with a responsibility which *Brown II* [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873] placed squarely on the School Board." Green v. County School Board, *supra*, 391 U.S. at 441–442, 88 S.Ct. at 1696. *See also* Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L. Ed.2d 733 (1968). The attempt to shift responsibility rarely works. The parents and children are either unable or unwilling to carry the burden.[10] Not surprisingly, they failed to do so in this instance.

At the close of the school year in which the "freedom of choice" plan was in operation (1969–70), black student enrollment in five of the six Westside elementary schools exceeded 99 per cent, and stood at about 70 per cent in the Westside "prestige" school. White enrollment *decreased* in four of the six Westside schools during the year. In twenty-eight of the district's forty-four elementary schools located outside Westside, white enrollment remained at 100 per cent. In nine other elementary schools outside the area, white enrollment was 90–95 per cent, in five 80–90 per cent, and in two 70–80 per cent.[11]

The school district's initial plan having failed, the district court's power and duty to enter a remedial decree was clear. "If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 15, 91 S.Ct. at 1276. However, both the school district and plaintiffs criticize the specific remedy approved by the district court.

The parties join in opposing the provision of the December 2 judgment "that the black enrollment in any elementary school in the Clark County District shall not exceed fifty percent of the total enrollment in such grade." [12]

The school board's objection rests upon statements in *Swann* that the Constitution does not require a particular racial balance or mixture of races in public schools, and that the existence of a small number of one-race schools does not in and of itself establish a constitutional violation. 402 U.S. at 22–29, 91 S.Ct. 1267.

In these passages, the Court was speaking only of the proof necessary to establish the existence of the

---

10. *See generally* United States Commission on Civil Rights, Southern School Desegregation 1966–'67, at 45–69 (1967).

11. Faculty desegregation, also, is a "goal that we have recognized to be an important aspect of the basic task of achieving a school system wholly free from racial discrimination. See, *e. g.*, Bradley v. School Board, 382 U.S. 103 [86 S.Ct. 224, 15 L.Ed.2d 187] (1965); Rogers v. Paul, 382 U.S. 198 [86 S.Ct. 358, 15 L.Ed.2d 265] (1965)." United States v. Montgomery County Board of Education, 395 U.S. 225, 232, 89 S.Ct. 1670, 1674, 23 L. Ed.2d 263 (1969). With respect to this aspect of the problem the district court concluded: "The evidence shows that the present policies have been and will be effective to establish a just ratio of white and black among the teachers and administrators within the limitations of the available pool of qualified applicants. The

Board has sincerely and effectively pursued its policies in this area."

Omissions and inconsistencies in the record make it impossible for us to determine the extent to which the elementary school faculties have been integrated. Plaintiffs have not raised this issue on appeal, and we wish to emphasize that we have not reviewed the district court's determination that adequate progress has been made in this area.

12. The district court later orally amended the judgment to make it clear that enrollment in any single *class* was not to be more than 50 per cent black. By the terms of the amended judgment of February 8, 1971, the 50 per cent requirement did not apply in those "special classes involving federal or other remedial or experimental programs of the School District."

constitutional violation that is a prerequisite to any judicial remedy at all. Once a constitutional violation has been found, different considerations apply. Then both the school district and the court are obliged to take all necessary steps to eliminate the past violation and its continuing effects. The Supreme Court specifically approved use of a mathematical ratio as "a useful starting point in shaping a remedy to correct past constitutional violations," 402 U.S. at 25, 91 S.Ct. at 1280, and warned that whenever a proposed remedial plan contemplated the continuance of schools all or predominately of one race, "The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part." 402 U.S. at 26, 91 S.Ct. at 1281.

As we have said, the district court found on legally and factually sufficient grounds that the one-race composition of Westside elementary schools was due in part to school district conduct violative of the Constitution. Although the school district's "freedom of choice" plan resulted in some integration in one Westside school, it failed to affect the one-race composition of the remaining five. The district court's order simply required that, in any new plan formulated by the school district, black enrollment in any class must not exceed 50 per cent. The court did not impose a fixed racial ratio upon classes in the school system—some classes might have 45 per cent black students, some 15 per cent, some none. The 50 per cent figure is a ceiling for black enrollment imposed for the purpose of compelling a real beginning toward eliminating the effects of past segregative practices.

Plaintiffs argue that the district court did not go far enough—that the court should have ordered the school district "to avoid schools substantially disproportionate to the system-wide racial enrollment" ; and that a "50% black school in Las Vegas is substantially disproportionate."

We are satisfied that "the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court." Swann v. Charlotte-Mecklenburg Board of Education, *supra,* 402 U.S. at 25, 91 S.Ct. at 1280. The district court has broad discretion in framing an equitable decree. 402 U.S. at 15–16, 91 S.Ct. 1267; Brown v. Board of Education, 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). The present decree is the beginning, not the end, of the remedial process. No doubt it will be modified and adjusted in the light of progress made in the elimination of effects of segregation.

Plaintiffs' principal complaint is that the "Sixth Grade Center Plan" imposes a disproportionate burden upon black students because black students in the first five grades will be bused, but only white students in the sixth grade. Plaintiffs point out that all black junior and senior high school students in the Westside area are already being bused to schools outside the area. They propose an alternate plan under which each Westside school would be "paired" with three white schools outside the area.

The school district offers several responses. It claims that the "Sixth Grade Center Plan" is based upon sound educational principles and does not burden black students disproportionately. The number of white and black students to be bused is about the same. All schools, families, and children in the district will be involved in the integration effort, rather than the select few under plaintiffs' alternative plan. The district argues that plaintiffs' alternative "pairing" plan would also permit whites to escape integration by moving to the attendance zone of a school not involved in the plan. The district's plan involves the least separation of siblings and provides the best racial mixing of staff since all sixth grade teachers will be together. Finally, the school district claims that its plan is the most economical.

There is a wide range of views regarding the propriety of such plans.[13] We need not evaluate the arguments pro and con in this case, however. The burden rested upon plaintiffs, as appellants, to establish that the district court exceeded its broad discretion in approving the particular plan involved here, and clearly plaintiffs did not sustain that burden.

The record before us does not contain a copy of the plan or even a description from which its details might be determined. We have the transcript of the hearings on plaintiffs' motion to modify the plan. However, the transcript contains neither a precise description of the plan nor specific information regarding the plan's mechanics or probable effects. On this record we cannot judge the desirability of the "Sixth Grade Center Plan," much less whether the district court abused its discretion in approving it.

The district court exercised close supervision over the implementation of the prior "freedom of choice" plan, and did not hesitate to set that plan aside when it proved ineffective. We have no doubt that it will respond in the same way upon a proper showing that the "Sixth Grade Center Plan" is operating in a way that is either ineffective or unfair.

## V

### Attorneys' Fees

We accept plaintiffs' position that in the exercise of equitable jurisdiction a trial court may award the prevailing party counsel fees and other litigation expenses not ordinarily taxable as costs. *See* Sprague v. Ticonic National Bank, 307 U.S. 161, 164–166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

The discretion of the trial judge in this area is necessarily broad and the scope of appellate review correspondingly narrow. Applying these principles, we have concluded that the trial court acted within its discretion in declining to award attorneys' fees.

We base our decision primarily upon two grounds. First, there was substantial doubt as to the school district's legal obligation in the circumstances of this case; the district's resistance to plaintiffs' demands rested upon that doubt, and not upon an obdurate refusal to implement clear constitutional rights. Second, throughout the proceedings the school district has evinced a willingness to discharge its responsibilities under the law when those duties were made clear. The school district complied with the court's initial desegregation order, promptly submitting the "freedom of choice" plan and working to see it succeed. Following the court's judgment of December 2, 1970, the school district proceeded without delay to formulate the "Sixth Grade Center Plan," and was prepared to implement this plan until the judgment was stayed by the district court's order. A different result would be appropriate if the school district had proved recalcitrant in the face of the lower court's decree. *See* generally Lee v. Southern Home Sites Corp., 429 F.2d 290, 295–296 (5th Cir. 1970); Bradley v. School Board, 53 F. R.D. 28, at 38, 39 (E.D.Va.1971).

## VI

### Stay

In special findings relating to the stay, the district court found that the "Sixth Grade Center Plan" could be implemented in the course of the school year without undue disruption of the educational process. Those findings, however, were entered at the beginning of the 1971–72 school term. The term is now well into its second semester. We do not know whether the findings accurately reflect the present situation. It

---

13. *Compare, e. g.,* Swann v. Charlotte-Mecklenburg Board of Education, 328 F. Supp. 1346, 1351–1352 (W.D.N.C.1971) [disapproving such a plan], *with* Mims v. Duval County School Board, 329 F.Supp. 123, 132–133 (M.D.Fla.1971) [approving such a plan].

would seem advisable, therefore, to require plaintiffs to resubmit their request that the stay be vacated to the district court where the feasibility of immediate implementation of the "Sixth Grade Center Plan" can be explored.

Affirmed.