**Jeanette BOOKER et al., Plaintiffs,**

**v.**

**SPECIAL SCHOOL DISTRICT NO. 1, MINNEAPOLIS, MINNESOTA, Defendant.**

**No. 4-71-Civil 382.**

United States District Court,
D. Minnesota,
Fourth Division.

May 24, 1972.

Charles Quaintance, Jr., Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for plaintiffs.

Norman L. Newhall, Lindquist & Vennum, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

LARSON, District Judge.

Plaintiffs are all school children residing in Minneapolis, Minnesota. This case was instituted by their respective guardians ad litem pursuant to Rule 17(c) F.R.Civ.P. as a class action under Rule 23 F.R.Civ.P. On February 8, 1972, this Court determined that the suit was an appropriate one for a class action and ordered that the class would consist of "all children who are residents of Minneapolis and who attend its public schools."

Plaintiffs complain that defendant has denied the class which they represent an equal educational opportunity by maintaining segregated schools. They further allege that this discrimination on the basis of race is a deprivation of their liberty without due process of law. It is plaintiffs' contention that these acts are violative of the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1981 and § 1983. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(3) and (4).

## CONTENTIONS OF THE PARTIES

Plaintiffs contend that there is and has been a continuous and intensifying pattern of segregation in the schools of the City of Minneapolis. Generally, they assert that this pattern is the result of two factors—(1) the imposition by the school board of a neighborhood school system on a city which is beset with intentional and widespread racial discrimination in housing, and (2) specific acts on the part of the defendant which it knew, or should have known, would create segregated schools.

Defendant admits that the schools of the City of Minneapolis are segregated. However, it is the District's contention that segregation has been caused by factors over which it neither had nor has control, i. e., racially segregated housing

patterns. It asserts that there has been no intention or purpose on its part to create or further segregation in the Minneapolis school system. Indeed, the District points to its Human Relations Guidelines of 1967 and 1970, as well as its 1972 Plan for Desegregation/Integration as indicia of its firm resolve to eliminate segregation which has been caused by discriminatory housing practices. Defendant further contends that a lack of intent to segregate on its part renders this Court powerless to grant the relief requested by plaintiffs, since a school district is under no constitutional duty to remedy that which it has not caused.

This Court feels little need to philosophize on the evils of racial segregation, other than to note its firm belief that it is both a moral and a legal wrong. The Court finds it unnecessary to make findings concerning the psychological harm inflicted by separation of the races. It is this Court's opinion that such findings, even buttressed by the most authoritative sociological and psychological data, are irrelevant to this lawsuit. Civil rights are not premised on sociological data, or moral platitudes. Instead, they are rooted solely in that "living document" which contains the very essence of American life—the Constitution. That document, and it alone, must provide the answers in this case. Neither sociologists' findings nor the clamour of misguided extremists have any bearing on the rights of these plaintiffs. The answer can only come from sober judicial reflection, free from the rhetoric of would-be demagogues and frightened parents.

It is an uncontroverted fact that the schools of the City of Minneapolis are segregated. Segregation imposed by law is unconstitutional. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Therefore it is the duty of this Court to objectively examine the facts in an effort to determine if the defendant has fulfilled its constitutional duty to the plaintiffs and, if not, what more must be done. This is not an effort to assess blame; it is an effort to vindicate plaintiffs' rights. Blame for segregation rests firmly on the shoulders of all of us.

. FINDINGS OF FACT

1. The defendant herein operates 68 elementary schools, 15 junior high schools, and 11 high schools within its boundaries, which includes all of the City of Minneapolis, Minnesota.

2. For the 1971–1972 school year 65,201 students were enrolled in the District. Of these, 55,735 were Caucasian, 6,351 were Black, 2,225 were American Indian, and 890 were of other minority or ethnic backgrounds.

3. There are 3,923 certificated personnel employed by the District. Of these 3,657 are Caucasian and 266 are Minority Americans.

4. The schools operated by defendant are segregated on the basis of race.

5. Racial segregation is most pronounced in the elementary schools of the District. Over 55% of the Black elementary school children attend schools with a Black enrollment of over 30%, while 74% of the White elementary school children attend schools with Black enrollments of less than 5%. There are 27 elementary schools which have a minority enrollment of less than 5%, while there are 13 elementary schools which have a minority enrollment of over 30%. Hay, Bethune, and Willard have minority enrollments of over 70%; Loring, Wenonah, Audubon, and Lake Harriet each have less than six minority students and Pillsbury has none.

6. At the junior high level, over 68% of the minority junior high students attend schools with over 30% minority enrollments, while almost 63% of the White students attend junior high schools with less than 5% minority enrollment. Lincoln Junior High has over 72% minority enrollment, while Southwest Junior High has but five minority students.

7. Two Minneapolis high schools have minority enrollments of over 30%

while four have minority enrollments of less than 4%.

8. The size and location of Bethune School, which was constructed in 1968, were intended to have the effect of continuing the pattern of racially segregated schools which had existed in Minneapolis since at least 1954. From its inception it was clear that the location of the school would cause it to have an extremely high Black enrollment. In fact, since its doors were opened, it has always been at least 50% Black. By constructing Bethune with a capacity of 900 instead of the 500–600 optimum which is generally used by the District, the defendant intentionally increased segregation. Building a school of that size on the near North side insured that most of the children in that predominantly Black area of the City would go to one school rather than spilling over into neighboring schools with larger majority enrollments. Indeed, the name itself is evidence of the defendant's intention that this was to be a Black school. It is hard to imagine how a school could be more clearly denominated a "Black school" unless the words themselves had been chiseled over the door.

9. The addition of seven new classrooms to the Field elementary school in 1964 had the intended effect of increasing racial segregation. Although Field, which at the time was 40% Black, had more students (613) than any of the four surrounding predominantly White elementary schools (Northrup, 100% White, 370 pupils; Hale, 100% White, 609 pupils; Fuller, 100% White, 552 pupils; Page, 100% White, 304 pupils); nonetheless the defendant significantly increased its size. The effect was to maintain the high percentage of Blacks at Field, thus making it the identifiably "Black school" in south central Minneapolis while keeping Fuller, Hale, Northrup, and Page as "White schools." The District offered no alternative justification for its decision.

10. In 1967 an addition was added to Washburn High School. At the time Washburn was over-enrolled by some 600 students. At the same time, Central High School, which is adjacent to Washburn, was running at about 600 pupils below its rated capacity. Central had a Black enrollment of 23% while less than 3% of Washburn's students were Black. At no time during this period was any attempt made to alleviate the overcrowding at Washburn by moving the boundary between Washburn and Central. Instead, after pressure had been exerted by parents of Washburn pupils, the defendant built a major addition to Washburn which had the effect of increasing segregation in the Minneapolis Public Schools. The defendant advanced no reasons nor justifications for this course of conduct. Therefore, when viewed along with other actions of the defendant, this Court views the addition at Washburn to have been racially motivated.

11. The defendant aided in increasing segregation in its schools by the location it chose for portable classrooms. In 1965 a portable classroom was erected at Field. The effect was to further increase the segregation caused by the addition which had been completed in 1964. (See Finding 9, supra.) This was done in spite of the fact that Hale and Northrup schools, close by, were underenrolled. Likewise, portables were erected at Mann and Bancroft in 1968–69. Both schools had relatively high Black populations—29.1% and 26.1%, respectively. This was done despite the fact that there was room for more students at two adjacent schools—Corcoran (1.1% Black) and Standish (.2% Black). The defendant made no attempt to show any reasons why portables were used in these instances instead of merely changing boundaries.

12. The decisions of the defendant as to school size over the past fifteen years have also had the effect of increasing racial segregation. The pattern that emerges is that in areas where there were small White neighborhoods adjacent to large minority neighborhoods, abnormally small White elementary schools were constructed, while at the

same time large Black elementary schools were maintained; the most recent and notable case concerns Page and Field schools. Page School was constructed in 1958 with a capacity of 300, thus making it the fifth smallest school in the District. This compares with adjacent Field which has had an enrollment of over 600 until this year when it was paired with Hale. No explanation was given of why Page was designed to accommodate so few pupils. In light of the defendant's policy of building schools with capacities of 500–600, a school of such significant deviation on the perimeter of a minority area can only be seen as an attempt to further segregation.

Notable also is Bryn Mawr, third smallest elementary school, which is adjacent to the largest elementary school —Harrison. An addition was constructed at Harrison in 1960 despite the availability of a larger site with a lower density of pupils at Bryn Mawr. Again, the defendant offered no alternative reason for its decision.

13. These decisions as to size and location of schools have had the intended effect of increasing or at least maintaining segregation in the defendant's schools.

14. In 1968 a boundary change was instituted between Washburn and Southwest High School. The change represented a decision by the defendant to transfer students from heavily overcrowded Washburn to Southwest, which was only slightly over capacity. This decision was made in spite of the fact that another adjacent high school, Central, was far below capacity. Both Southwest and Washburn are predominantly majority schools and Central has the highest percentage of minority students in the District. Viewed in this context and within the context of the defendant's general course of conduct, the Court views the boundary change to have been racially motivated, especially in light of the fact that no alternative reason for the change was presented at trial.

15. The defendant's policy of allowing special transfers from the school to which a student is assigned to another school upon the agreement of the principals of the two schools has also contributed to racial segregation. A member of the defendant's administration admitted that race was a major factor in many of these transfers. In addition, testimony at trial showed that administrators have informed parents of what "reasons" would be sufficient in order to have their child transferred. The fact that the largest numbers of principal transfers occurred from such schools as Bryant, Lincoln, Central, North, Bancroft, and Willard—all of which have heavy concentrations of minority pupils —gives added weight to the conclusion that principals' transfers have been used by the defendant as a way of continuing and increasing segregation in its schools.

16. The Court finds that it has been the general course of conduct for the District to create optional attendance zones along the perimeters of minority neighborhoods. Often the intended effect of optional zones has been to allow White students to "escape" from schools with heavy minority enrollments to schools which are identifiably White.

17. There has never been a Black teacher, administrator, or other certificated employee assigned to Armatage, Barton, Fuller, Fulton, Hiawatha, Keewaydin, Lowry, Prescott, Waite Park, or Wenonah elementary schools. The following schools have had but one Black teacher throughout their history: Bremer, Bryn Mawr, Burroughs, Cleveland, Cooper, McKinley and Webster elementary schools and Anthony Junior High. Lind, Holland, and Schiller elementary schools have had but two Black teachers.

The number of Black certificated personnel in the District has risen dramatically since 1966, due in large part to the efforts of Dr. Davis and the commitment of the Board of Education to integrate the faculty of the schools. However, the placement of the minority teachers once they have come into the

system has been such that faculty segregation still exists. Sixty-one per cent of the Black elementary teachers are located in 14 elementary schools, each of which has over 15% Black enrollment. Forty-eight per cent of the Black secondary certificated personnel are in the three secondary buildings which have over 30% Black students.

18. Another form of discriminatory teacher placement in the District relates to the race of the student rather than to the race of the teacher. That is the District's practice of assigning less experienced and lower paid teachers to schools with the highest percentage of minority students. For example, of 68 elementary schools the five with over 30% Black enrollment rank 44th, 52nd, 61st, 67th and 68th when ranked according to the average classroom teacher's salary. The two junior highs with over 30% Black enrollment rank 12th and 15th out of 15 in the same category. The one senior high with over 30% Black enrollment ranks 11th out of 11.

The average number of probationary teachers on the faculties of the five elementary schools with over 30% Black enrollment (36.3%) is significantly higher than the other elementary schools in the District (21.8%). Likewise, the same situation is present at the junior and senior high levels.

The average teacher in the elementary schools with over 30% Black enrollment is also at a much lower step than the average teacher in other schools in the District. The five schools with over 30% Black enrollment rank 49th, 54th, 62nd, 65th, and 68th when ranked with the other schools according to the average step of their teachers. Likewise, the two junior highs with more than 30% Black enrollment rank 11th and 15th out of 15 in a similar comparison, and Central High School ranks 11th out of 11 high schools.

19. The District's policy concerning transfer of teachers has also contributed to faculty segregation. Under this poli-cy the teacher with the greatest amount of seniority who wishes to transfer to a given school receives preference over all other applicants for transfer. Since it is only in the last five years that extensive recruitment and hiring of minority teachers has occurred, it is obvious that most minority teachers are far down the seniority list. This makes it virtually impossible for a minority teacher to transfer to another school. The effect is thus: (1) many of the newest teachers are members of minority groups due to the District's increased recruitment; (2) many new teachers' first assignment is in schools with high proportions of minority students; therefore (3) many Black teachers who have little seniority are locked into minority schools, and have virtually no chance of transferring to "White schools." Such a policy obviously contributes to the segregated character of the Minneapolis faculty since it makes mobility from school to school very difficult for new teachers, many of whom happen to be Black.

20. The Minneapolis School Board asserts that it has a legal right to transfer any teacher to any school if it finds it to be necessary. The Board has seldom, if ever, used this power in the past, and it has never been used to achieve faculty integration.

21. After a teacher has been hired by the personnel department, he or she is interviewed by the principals of various schools where there are openings. The principal has an absolute veto over any teacher coming into his or her school. While written reasons must be given for a rejection of a teacher seeking to transfer to a new school, apparently a principal need give no reasons for rejecting a new teacher in the District. It is obvious that a principal seeking to maintain an all White faculty at a majority school has little trouble in doing so. This policy has been partially responsible for the failure of the defendant to have an integrated faculty.

22. The defendant has made a conscientious effort to recruit Black adminis-

trators since Dr. Davis became superintendent in 1967. The number of Black administrators has increased from one when Dr. Davis began to a current high of 19. However, the administrators, just like the teachers, are segregated insofar as the students are concerned. Of the 19 Black administrators, only four are in positions in schools which have under a 30% Black enrollment. The testimony of several Black administrators who formerly were employed by the defendant indicates that the policy of the District has been to place Black administrators in schools with high Black populations.

23. This assignment policy of both teachers and administrators is partially responsible for the fact that there are presently schools in the District which are identifiable by race.

24. The record indicates a high degree of residential segregation within the boundaries of the defendant School District. The near north side of the City and a large portion of south central Minneapolis contain heavy concentrations of minority groups. At the same time, the perimeter of the city is largely White.

25. Residential segregation in Minneapolis is in large part due to racial discrimination. Prior to 1962 it was common practice for members of the Board of Realtors to only show minority persons houses in certain areas. Indeed, it was thought [too] unethical to introduce minority residents into a neighborhood for the first time. Even after Federal legislation outlawing housing discrimination in 1962, sellers could declare their property to be exempt and thus they could make it unavailable for a minority purchaser.

While legislation and efforts by concerned realtors have made progress in the area of housing discrimination in Minneapolis, there is "still far to go." Indeed, the testimony reflects that Black families are still only shown houses within the "Black area" unless they make a concerted effort to see housing in other parts of the City.

26. The record clearly indicates that the defendant has been aware of the existence of residential segregation, and the discrimination which underlies it.

27. As result of the actions of the defendant set out above and the widespread racial segregation in housing within the District, the public school students of Special School District # 1 have been segregated on account of race, and certain schools—Willard, Bethune, Harrison, Mann, Hay, Bryant, Lincoln, and Central—have been purposefully maintained as identifiably "Black schools."

28. Since the institution of this suit great strides have been made by the District as far as planning and preparation for a concerted effort to overcome the effects of past racial segregation. The Urban Transfer Program, an attempt at voluntary desegregation, the pairing of Field and Hale elementary schools in the fall of 1971, and the affirmative recruitment program suggest some effort, though minimal, to eliminate racial segregation.

29. Finally, the Court finds that the factor largely responsible for the defendant's failure to take significant affirmative action to alleviate the segregated condition of the schools has been public pressure not to integrate. School Board members themselves admitted that public pressure against desegregation/integration has influenced their decisions. A clear case in point is the delay, after vehement public objection, in the pairing of Field and Hale schools.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1343.

■ 2. The Constitution absolutely prohibits segregation imposed by law. Conversely, it requires that the public school systems in this country be

integrated.[1] Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

■ 3. This Court agrees with the Fifth Circuit that the *Brown* decision rests on the view that racial segregation is, in principle, a denial of equality to the minority against whom it is directed. United States v. Jefferson County Board of Education, 372 F.2d 836, 871 (5th Cir. 1966), aff'd on rehearing, 380 F.2d 385 (1967), cert. denied sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L. Ed.2d 103 (1967).

■ 4. The Constitution, and therefore its interpretation in *Brown*, applies equally to all public school systems regardless of whether segregation is imposed by statute as it has been in the south, or whether it is imposed covertly as it has been in the north and west. Kelly v. Guinn, 456 F.2d 100 (9th Cir., 1972); Taylor v. Board of Education of City School Dist. of City of New Rochelle, 191 F.Supp. 181 (S.D.N.Y.1961), aff'd, 294 F.2d 36 (2nd Cir. 1961).

■ 5. The mandate of *Brown* has been clear. However, uncertainty has developed over what in fact constitutes "segregation imposed by law."[2] The uncertainty is due in large part to the fact that the Supreme Court has specifically withheld decision on the question of whether school segregation caused by the implementation of a neighborhood school system on a district with racially segregated housing patterns is "segregation imposed by law."[3] Until this question is answered, no Court can be certain what the ultimate limits of the constitutional prohibition against segregation in education may be. However, it is beyond dispute that:

(a) if the State and/or the school administration has taken any action with a purpose to segregate, and

1. There appears to have been some controversy over the exact meaning of the terms "desegregation" and "integration." Apparently, the words were used during the trial by various school administrators and the plaintiffs' expert in a sense different from the way they have been used by the Supreme Court and other lower Federal courts.

At trial "desegregation" was defined as "merely the mixing of bodies," and thus was but a step on the road to "integration" which was defined as "the combination of different racial groups into one society."

Courts have used the two words interchangeably; there has never been a Supreme Court case in which the Court distinguished desegregation from integration. Being mindful of the problems which can be caused by uncareful use of language, this Court has followed the traditional legal pattern and used the two words as if they were synonymous throughout the Findings, Conclusions and Order. See United States v. Jefferson County Board of Education, 372 F.2d 836, 846, n. 5 (5th Cir. 1966), aff'd on rehearing, 380 F.2d 385 (1967), cert. denied sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

2. This uncertainty has developed due to the distinctions made by courts between "de facto" and "de jure" segregation. "De jure" school segregation is segregation imposed by law or by public policy pursued under color of law. On the other hand, school segregation is considered "de facto" when it results from pupil assignment policies not based on race, or other conditions for which government is not directly responsible. Hobson v. Hansen, 269 F.Supp. 401, 493 (D.C. D.C.1967).

For purposes of this decision the Court has attempted not to use these terms since they are imprecise and have been used differently by different courts. It is clear that, as the terms have been used by most courts, "de facto" segregation clearly is present in Minneapolis. However, this decision is in no part based on findings of "de facto" segregation. It has been unnecessary to reach the question of whether "de facto" segregation is constitutionally prohibited here, since the defendant has acted in a manner which was intended to create and/or increase segregation, and thus "de jure" segregation also exists in Special School District # 1.

3. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 23, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

(b) if that action has had the effect of creating or aggravating segregation in the schools of the District, and

(c) if segregation currently exists, and

(d) if there is a causal connection between the acts of the school administration and the current condition of segregation,

then there is segregation which is imposed by law; and such is prohibited by the Fourteenth Amendment to the Constitution. Keyes v. School District No. 1, Denver, Colorado, 313 F.Supp. 61, 73 (D.C.Colo.1970).

■ 6. It is violative of the Fourteenth Amendment for public school officials to make educational policy decisions which are based wholly or in part on considerations of the race of students or teachers, and which have the effect of increasing or aggravating racial segregation in the public schools. Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833 (E.D.La.1967), affirmed, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Spangler v. Pasadena City Board of Education, 311 F. Supp. 501 (C.D.Cal.1970); Taylor v. Board of Education of New Rochelle, *supra*.

■■ 7. When school officials consistently draw attendance lines so as to increase or further aggravate racial segregation within their district, the presumption arises that they have done so in order to promote racial segregation. Spangler v. Pasadena City Board of Education, *supra*; United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N.D.Ill.1968). In the absence of an affirmative showing of justification for attendance lines other than racial ones, a court has no other choice than to conclude that racial considerations were the motivating factors.

■ 8. Construction policies which create or aggravate racial segregation are an "important indicia of a segregated system." A pattern of school construction and/or abandonment is enti-

tled to great weight in determining the existence of legally imposed school segregation. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Kelly v. Guinn, *supra*.

■ 9. When school officials vary the size of schools depending on the area of the district in which they are built, and when they allow some schools to become over-enrolled while adjacent schools are substantially below capacity, in the absence of alternative justification, these actions must be presumed to be racially motivated if they have the effect of creating or intensifying racial segregation. Davis v. School District of City of Pontiac, 309 F.Supp. 734 (E.D. Mich.1970), aff'd 443 F.2d 573 (6th Cir. 1971); Spangler v. Pasadena City Board of Education, *supra*.

■ 10. No official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

■ 11. Where it is possible to identify a school as either "White" or "Black" by reference to the racial composition of its teachers, a prima facie case of violation of Fourteenth Amendment rights is shown. Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 18, 91 S.Ct. 1267, 28 L.Ed.2d 554; see Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

■ 12. Teacher assignment is so clearly subject to the complete control of local authorities that the assignment of a large proportion of Black teachers to schools with the highest percentages of Black students is strong evidence that racial considerations have been permitted to influence the overall school policies and practices of the district. In the assignment of teachers there are no extrinsic factors such as residential segregation or natural barriers to transportation behind which a school district can

hide in order to escape its constitutional duty to provide integrated schools for its pupils. Kelly v. Guinn, *supra*; Davis v. School District of Pontiac, *supra*.

13. In order to overcome the effects of its past discrimination in assigning teachers, a district has an obligation to allocate certificated and non-certificated personnel so that no school is identifiable by the composition of its faculty as being tailored for a heavy concentration of either Black or White students. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Brewer v. School Board of City of Norfolk, 397 F.2d 37 (4th Cir. 1968).

14. The responsibility for faculty and staff desegregation is that of the defendant, not the teachers. The achievement of desegregated faculties may not be made contingent upon the willingness of teachers to voluntarily transfer from their present schools. If necessary, a district must use its power to assign or reassign teachers in order to comply with the constitutional requirement. United States v. Board of Education of City of Bessemer, 396 F.2d 44 (5th Cir. 1968); Monroe v. Board of Commissioners of City of Jackson, 380 F.2d 955 (6th Cir. 1967); Kelley v. Altheimer, 378 F.2d 483 (8th Cir. 1967).

15. A school district may not, consistent with the Fourteenth Amendment, maintain segregated schools because of, or permit educational choices to be influenced by, a policy of racial segregation in order to accommodate community sentiment or to appease the wishes of even a majority of the voters. Cooper v. Aaron, 358 U.S. 1, 15–16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967); Monroe v. Board of Commissioners, *supra*; United States v. School District 151, *supra*; Spangler v. Pasadena City Board of Education, *supra*.

16. As a matter of law, the intended and inevitable effect of a series of policy decisions made by the defendant Special School District # 1, Minneapolis, Minnesota, with respect to size and location of schools, attendance zones, enrollment of various schools, transfer policies, and teacher assignments as described in the Findings of Fact set out above has been to aggravate and increase the racial segregation in its schools. These policies have been especially offensive due to the defendant's knowledge of the extensive nature of housing segregation within its bounds. Brown v. Board of Education, *supra*; Taylor v. Board of Education of City School District of City of New Rochelle, *supra*; Spangler v. Pasadena City Board of Education, *supra*; Davis v. School District of City of Pontiac, *supra*; United States v. School District 151 of Cook County, Illinois, *supra*.

## ORDER FOR JUDGMENT

This Court having fully considered the testimony and documents offered at trial, and the depositions and exhibits attached thereto, has concluded that it has been shown that there exists a condition of segregated schools in the City of Minneapolis, and that the intentional actions of the defendant herein are in part responsible for this condition.

It is therefore ordered that the defendant, its school board, its administrators, its employees, its agents, and all those who are in active concert or participation with them, are hereby permanently enjoined from discriminating on the basis of race or national origin in the operation of Special School District # 1 or any successor district or districts which may be formed therefrom. Such injunction is directed particularly at, but not limited to, the discrimination in assignment of students *and* teachers within the District. As is set out more completely below, the defendant shall take affirmative action to disestablish school segregation and eliminate the effects of its prior unlawful activities. That which shall constitute *minimal*

compliance with this Order is as follows:

1. The defendant will proceed to implement its Plan for Desegregation/Integration as adopted with four amendments by the School Board on April 25, 1972. The Court is greatly impressed by the obvious amount of consideration and preparation which went into this Plan. Its attention to staff development and human relations training is laudable and should, if anything, be stressed more strenuously. This Court is of the opinion that the Plan presented by the defendant meets constitutional requirements, except for those areas indicated below.

In accepting the District's plan, the Court is in effect rejecting most of the changes suggested by the plaintiffs' expert. This is no reflection upon him. He appeared to be objective, fair, and reasonable. However, this Court agrees with Judge Eisele that if the District's plan meets constitutional requirements a court need look no further. "It is for the school board, not the Court to establish educational policy." Yarbrough v. Hulbert-West Memphis School District No. 4, 329 F.Supp. 1059, 1064 (E.D. Ark.1971). This is especially true when the defendant appears to be exercising good faith. The preparation of a plan of this quality in the face of this lawsuit indicates that this defendant is not a recalcitrant district whose promises are suspect.

2. The defendant's plan shall be modified in the following manner:

(a) Under the District's Plan, Bethune, new Webster, and Willard elementary schools, and the elementary schools in the Hay, Penn, Loring pairing would have minority enrollments of close to or over 40%. In light of the minority population of the District and the racial composition of other schools therein, the Court feels these percentages are too high.

Therefore, the Plan should be modified so that no more than 35% of the student body of any one school consists of minority children.

This is not to say that the Constitution requires a fixed racial balance in public schools. The Court only uses the figure as a "useful starting point in shaping a remedy [for] . . . past constitutional violations." Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 25, 91 S.Ct. at 1280. This is a very limited use of a mathematical ratio since it will only affect five of the defendant's 94 schools. This is clearly within the equitable discretion of the Court. Swann v. Charlotte-Mecklenburg Board of Education, supra; Kelly v. Guinn, supra.

(b) The District's Plan is also insufficient in that it does not go far enough in providing for faculty integration. Therefore, the defendant shall comply with the following formula suggested by Dr. Stolee. Before there are more than two minority teachers in any one elementary school, there shall be at least one minority teacher in all elementary schools. For these purposes, principals and assistant principals shall be considered teachers. The faculties of the secondary schools shall be integrated so that each has approximately the same proportion of minority to majority teachers as there are minority to majority teachers in the whole system.

While the Court is convinced that there are sound reasons of educational policy for delaying final implementation of defendant's Plan until the 1974–75 school year, it can see no similar justification for delay of faculty integration. Therefore this Plan for faculty integration shall be fully completed by the opening of the 1973–74 school year. Every effort should be made to complete one-third of the

changes necessary to achieve this result by the beginning of the 1972–73 school year.

3. The District shall not allow any transfers by principal's agreement or otherwise which have the effect of increasing the segregated nature of either the sending or receiving schools. United States v. Board of Education, Independent School District No. 1, Tulsa County, Oklahoma, 429 F.2d 1253 (10th Cir. 1970).

4. Any construction of new schools or additions to old schools beyond what is contemplated in the Plan shall be submitted to the Court for approval. It is not anticipated that any plans which would have the effect of increasing current segregation would be approved. United States v. Board of Public Instruction of Polk County, Fla., 395 F.2d 66 (5th Cir. 1968).

5. Before any changes may be made in the District's Plan for Desegregation/Integration which will have the effect of increasing or aggravating the existing segregation in defendant's schools or which will in any way delay full implementation of the Plan, the changes must be approved by this Court.

6. Periodic reports shall be made by the defendant every six months until ordered otherwise by the Court. Such reports shall indicate the number of students and teachers by race for each school in the District. They shall also advise specifically of what steps have been taken toward implementing the Plan, and indicate any place where the timetable of the Plan is not on schedule. The reports shall be filed by the 31st of December and the 1st of July each year, commencing December 31, 1972. A copy of the report shall be presented to plaintiffs' counsel at the time it is filed with the Court, and his comments will be seriously considered.

It is so ordered.